# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| ***Start Skydiving, LLC*** | : | Case No. |
| 1711 Run Way | : | |
| Middletown, Ohio 45042 | : | |
| | : | JUDGE |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT FOR CIVIL RIGHTS** |
| | : | **VIOLATIONS UNDER 42 U.S.C. § 1983,** |
| ***The City of Middletown*** | : | **COMPUTER FRAUD AND ABUSE** |
| One Donham Plaza | : | **UNDER 18 U.S.C. § 1030, BREACH OF** |
| Middletown, Ohio 45042 | : | **CONTRACT, MISAPPROPRIATION OF** |
| | : | **BUSINESS DATA, AND DEFAMATION** |
| and | : | |
| | : | **(Jury Demand Endorsed Hereon)** |
| ***Matt Eisenbraun*** | : | |
| 6760 Imhoff Road | : | |
| Oxford, Ohio 45056 | : | |
| | : | |
| and | : | |
| | : | |
| ***Daniel Dickten*** | : | |
| 2310 State Route 28 | : | |
| Goshen, OH 45122 | : | |
| | : | |
| Defendants. | : | |

For its Complaint against Defendants The City of Middletown (the "City"), Matt Eisenbraun, and Daniel Dickten (collectively, "Defendants"), Plaintiff Start Skydiving, LLC ("Start Skydiving," "Start," or "Plaintiff") states as follows:

### INTRODUCTION

1. Start Skydiving is a major economic driver for the City of Middletown and Butler County, with its world-renowned operations attracting nearly 50,000 people in a typical year to the Middletown Regional Airport for recreational activity, military training and aerospace research

& development. Start thus helps generate substantial traffic and revenue for hotels, bars, and restaurants – with an estimated economic impact of $5 million to $10 million annually for the Middletown area.

2. However, this case is about the ongoing vindictive, corrupt, and deceitful attempts by the City and its key personnel to kick Start out of the airport and to harm its business, despite Start's 20-year lease at the airport which runs through 2029.

3. These efforts have involved City personnel: (a) hacking into Start's online financial database to spy on Start and steal its business data in violation of Start's civil rights under 42 U.S.C. § 1983; (b) violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (c) spreading false and defamatory statements about Start's operations, designed to undermine Start in the community; and (d) trumping up claims of unsafe operations vis-à-vis other airport users, when the reality is that: (i) no Start customer or employee has ever injured any other airport user in its 12-year history at the airport; and (ii) the City actually declined the opportunity to have a proper safety analysis done by a consultant, choosing instead to have him simply advocate for its position that Start should be moved away.

4. Accordingly, Start seeks judicial intervention to stop this wrongful conduct and to compensate Start for the City's civil rights violations, computer hacking, breaches of contract, and other torts, which have greatly damaged Start's business and reputation.

## THE PARTIES, JURISDICTION, AND VENUE

5. Start is a skydiving and aviation company located at 1711 Run Way, Middletown, Ohio 45042.

6. The City is a municipality with its principal place of business at One Donham Plaza, Middletown, Ohio 45042.

7. Matt Eisenbraun is the Assistant Economic Development Director for the City of Middletown, and is believed to reside at 6760 Imhoff Road, Oxford, Ohio 45056.

8. Daniel Dickten recently served as the Airport Manager for the City of Middletown, until being removed from that position amid controversy, and is believed to reside at 2310 State Route 28, Goshen, Ohio 45122.

9. Personal jurisdiction and venue are proper in this Court because Start and the City of Middletown are both domiciled in Butler County; Dickten and Eisenbraun are both Ohio residents; and the underlying transactions giving rise to the claims herein occurred in Butler County, Ohio.

10. Federal subject matter jurisdiction exists here under 28 U.S.C. § 1331 by virtue of Plaintiff's claims under 42 U.S.C. § 1983 and 18 U.S.C. § 1030.

11. Moreover, the Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 because they are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy. Likewise, the state law claims and the federal claims all arise from the same set of operative facts. Indeed, this entire case, including Defendants' federal statutory violations and the state law claims, is about the City's systemic and continuing efforts to treat a valued member of its community, Start, unfairly and to try to force Start from its leased property at the Middletown Regional Airport.

## FACTS

### A. START'S TOP RANDKED SKYDIVING OPERATIONS ATTRACT SUBSTANTIAL BUSINESS AND TOURISM TO MIDDLETOWN

12. Start provides top ranked skydiving operations, with its drop zone in Middletown recently ranked number 1 in the world. Start provides services related to all-things skydiving,

3

including training, jumping, and parachuting for skydivers of all experience levels to include civilian and military entities.

13. Annually, Start typically attracts nearly 50,000 people to Butler County and, by all objective criteria, is a reliable economic staple for the region, boosting the local economy with every tourist and military contract it attracts.

### B. START AND MIDDLETOWN AGREED TO A 20-YEAR LEASE IN 2009, WITH START IMMEDIATELY STARTING SKYDIVING OPERATIONS WHICH CONTINUE TO THIS DAY

14. On December 31, 2009, Start and the City entered into a Lease Agreement for the property located at 1711 Run Way (the "Property"), which is located at the Middletown Regional Airport/Hook Field. (A true and accurate copy of this initial Lease Agreement is attached hereto as **Exhibit A**.)

15. In particular, the City agreed to: (a) lease 8,000 square feet of hangar space at the Property; (b) expand the exterior of that hangar by an additional 10,000 square feet for office space for Start to utilize, with the expansion cost paid by the City; and (c) make certain other improvements to the Property and leased premises, including providing an additional 6,000 square feet of storage space for Start.

16. For the office space, the City was initially required to provide the foundation, steel frame, and outer skin of the new structure, including all doors, windows, and a roof. Per a lease amendment dated March 2, 2010, the City also agreed to pay for construction of interior walls, HVAC, wiring, and plumbing. (A true and accurate copy of the lease amendment is attached hereto as **Exhibit B**. Exhibits A and B together are referenced herein as the "Agreement.")

17. Start immediately began its Skydiving operations at the airport, as intended by the parties. Those operations have continued for the past 11 years and continue to this day.

18. Start began paying rent for the leased space at the Property, which was to be used as a private, corporate hangar for commercial and business-related purposes. The rent was scheduled to increase once the City performed the agreed improvements.

19. But the City never performed the agreed improvements. It never performed because it changed its mind and seeks to kick Start out.

C. **AFTER A NUMBER OF YEARS, WHEN THE CITY FAILED TO FOLLOW THROUGH ON ITS PROPERTY IMPROVEMENT OBLIGATIONS IN THE LEASE, AND AFTER THE CITY'S LEADERSHIP CHANGED, THE CITY BEGAN PLOTTING TO REMOVE START FROM THE AIRPORT**

20. For a number of years, the City and Start worked in a cooperative manner, with Start even serving as the Fixed Base Operator (FBO) for the airport, thereby running much of the airport's business operations for the City. Thus, Start purchased the FBO operation and occupied the FBO space at the airport at 1707 Run Way, mitigating the City's breach in failing to construct the agreed-upon office space.

21. While occupying the FBO space, Start (and/or an affiliated company) also entered into a lease for the second floor space of 1707 Run Way above the FBO space in order to conduct skydiving training/business operations. Start and its affiliate invested hundreds of thousands of dollars to improve the leased premises, including substantial capital improvements.

22. However, by 2016, it became apparent that the City had changed its plans and was considering removing Start from the airport. Indeed, the City developed a new Master Plan which did not include Start.

23. Accordingly, for council meetings in the Fall of 2018, City Manager Doug Adkins presented plans which bluntly asked the council members to either: (a) move forward either with "Status quo" involving Start; or (b) move forward with new ideas involving **"no skydiving**." See Exhibit C.

24. It was apparent that the City Manager and his staff (including Matt Eisenbraun and Dan Dickten) had invested significant time and effort into the "no skydiving option" and intended that option to prevail.

25. After that point, despite repeated requests, both written and oral, for the City to comply with the Agreement, the City has failed to honor its Agreement. In fact, the City recently demanded Start to vacate the FBO space that Start is using as office space – even though the City has yet to construct the office space it agreed to construct for Start as part of the Agreement.

**D. THE CITY HAS FAILED TO HONOR ITS WRITTEN OBLIGATIONS, AND NOW IS ACTING TO FORCE START OFF THE AIRPORT WITH UNREASONABLE NEW DEMANDS**

26. The City has breached the lease Agreement by failing and refusing to provide the space and improvements that are required by the Agreement. The City is also knowingly and intentionally exacerbating the breach by now demanding Start to vacate the FBO space which Start has improved and is using as office space. (See Exhibits D and E, reflecting the City's position on lease issues, in which it offered on November 12, 2020, for Start to stay and continue to lease the FBO space, before reversing itself 24 hours later on November 13, demanding that Start vacate the FBO space by December 31, 2020.) The City is also now contradicting statements of its prior City Manager, Doug Adkins on October 17, 2019, where he wrote that "We have no intention of disrupting Start's operation." (Exhibit F.) The City is now threatening to evict Start from its current office space at the airport.

27. Specifically, the City is in breach because it has not provided the 10,000 square feet of office space and 6,000 square feet of storage space that it promised to provide in the Agreement.

28. Start spoke and wrote to the City on November 16 and November 25, 2020 (Exhibits G1 and G2) to again demand the office space the City had agreed to construct as part of

the Agreement. But the City will not provide the office space. It is acting to squeeze Start out, in breach of the Agreement.

29. Moreover, even beyond refusing to provide the storage space it was contractually required to provide to Start, the City offensively charged Start over $97,000 worth of storage/rental fees – which fees only arose because the City failed to provide Start the storage space it agreed to provide in the Agreement.

30. The prior City Manager repeatedly stated that the City would credit or reimburse Start for all the storage fees the City had charged. But to date, the City still has not done so. To the contrary, the City has again recently invoiced Start on November 2, 2020, claiming the Start owes the City money for past storage invoices – contrary to prior assurances.

31. The City owes Start reimbursement of the money which Start has been forced to pay for additional storage space, and owes Start the additional 6,000 square feet of storage area per the Agreement.

32. The City has also recently (via proposal dated November 12, 2020) demanded additional payments from Start for: (a) storage space that was supposed to be provided under the 2009 Lease; (b) usage of tarmac space for merely loading skydivers onto its planes; and (c) usage of airport space, on a per-square foot basis, for skydivers' landing areas (in violation of established safety principles and FAA guidance). The latter two items involve activities and usage that have been ongoing since 2009 without charge or issue (and it was understood and agreed as part of the lease Agreement that Start was permitted to utilize these areas without further charge for its business at the airport).

33. Further, it is inappropriate and contrary to FAA regulations for the City to charge skydivers on a per-square foot basis for safety, which is essentially what some of the City's new proposed charges seek to do.

34. Upon information and belief, the charges for tarmac usage are discriminatory and vindictive in that other similarly-situated businesses at the airport are not being charged for tarmac usage (especially not in the middle of a long term lease which included no charges for such usage despite such usage occurring for many years).

### E.  A CAMPAIGN OF CIVIL RIGHTS VIOLATIONS, SPOLIATION OF EVIDENCE, CORPORATE ESPIONAGE, THEFT OF DATA, AND DEFAMATION

35. The City's disputes with Start in recent years present a tale of civil rights violations, corruption, deceit, and vindictiveness by City personnel.  This has involved City officials engaging in corporate espionage through the hacking and stealing of Start's business data, spoliation of incriminating evidence in a dumpster at the airport, paying consultants to help discredit Start on safety without a safety analysis, and numerous false statements by City officials as detailed below.

36. Start Skydiving has been operating successfully at Hook Field since signing a lease in 2009, recently attracting nearly 50,000 customers per year, and serving as a major economic driver in the region.  Playing a key role at the airport, Start held the contract to serve as the FBO operator from 2012 through 2019.

37. However, Start's success at the airport – as well as its lease and its popularity with the Chamber of Commerce, the Middletown Visitors' Bureau and the Butler County Visitors' Bureau -- stood in the way of the City leaders' plans to remove Start from the airport.

38. Thus, City officials began a wrongful campaign designed to discredit, diminish, and undermine Start.  As their plans proved impractical, they lashed out ever more strongly and

unjustifiably against Start. The motives have now become utterly personal and vengeful, unsupported by any legitimate governmental interest. The wrongful, vengeful, and deceitful activity has included:

a. Recently-removed Airport Manager Dan Dickten, conspiring with Assistant Economic Development Director Matt Eisenbraun, engaged in financial and corporate espionage by directing a city employee and a former Start employee to assist them in hacking into Start's business management systems to steal data. This resulted in conversion of Start's business data. Evidence of this plan is reflected in a text message between Dickten and Eisenbraun dated July 22, 2019 (obtained through a public records request), attached hereto as Exhibit H.

b. In an effort to cover-up the espionage and hacking, Dan Dickten refused to produce certain additional text and/or email messages showing the wrongful plans – despite them being requested in public records requests. Instead, when Dickten was removed from his position amid controversy on other issues, he gathered the evidence in a trash can and threw it into a dumpster at the airport. Dickten thus engaged in spoliation of evidence.

c. In an effort to discredit Start's safety record in relation to its primary parachute landing areas, despite no deaths in 12 years relating to the location of its drop zones, Dan Dickten hired a consultant at Quadrex Aviation to promote a false narrative. Specifically, when Quadrex proposed a Safety Risk Assessment (SRA) at a cost of $24,000 or more, Dickten rejected it, saying that "The City is not looking for a complete SRA." (Exhibit I hereto.) Instead, Dicken simply asked Quadrex for "representation" as an advocate "supporting the relocation of the drop zones."

9

      (Exhibit I.) This confirms Dickten and the City are not concerned about safety, but instead, are merely interested in forced relocation for their own agendas of creating undue hardship upon Start's business operation.

d. Despite rejecting a safety analysis, and without support, City personnel continue to harp on the false narrative that "the situation is so dangerous for our users." See Exhibit J, email from City representative Susan Cohen email to Ben Thaeler, cc to Council Member Ami Vitori, July 16, 2020. The Airport manager even falsely stated, in a March 16, 2020 report, that the U.S. Parachute Association (USPA) "now supports the assessment conducted by Quadrex" as to the need to determine "if there are other safer locations" and the need to move Start out of "object free areas." (Exhibit K hereto.) In fact, the USPA then wrote directly to the City to make clear that: "[Dickten's] statement is false in several respects. The USPA has not and does not support the Quadrex assessment. Nor does the USPA agree that a drop zone may not encompass any portion of an airport's object-free area." (Exhibit L hereto.)

e. The recent false statements by Dicken are simply the latest in a string of false statements by City personnel made in this wrongful and deceitful effort.

    i. On or about December 3, 2018, Dan Dickten falsely told Start's fuel supplier (AVFuel) that Start was requiring its fuel service employee, Jesse Schulte, to serve Start aircraft before ever serving a transient aircraft. Due to this falsity and other wrongs by the City, Start lost the FBO contract at the airport.

ii. On December 3, 2019, Matt Eisenbraun falsely stated that Start was removed as the FBO operator after "numerous service complaints from pilots who were unable to get their planes fueled because the line services personnel were busy supporting the skydiving operations." (Exhibit M.) The proper evidence and information contradicts this claim.

iii. On or about February 19, 2020, a city official – believed to be Matt Eisenbraun or Dan Dickten – reported to the fire department that Start trucks were being stored improperly. In fact, they were being stored the same as the City's. The report was part of a malicious effort to disrupt Start's operations. Both the City and Start then moved their trucks. The malicious nature of the report was proven because when the City moved its trucks, it moved them into Start's preferred fueling areas for planes – in order to further disrupt Start. The City chose that area for parking its trucks due to a false claim that the City trucks could not be parked elsewhere where extension cords were necessary. (Dickten and Eisenbraun claimed that the fire department would not permit use of extension cords for the trucks). The City then needlessly spent $6800 for an electric outlet for the new location, only to be told by the fire department that extension cords are permitted. Again, the false information about supposed fire department requirements was used to disrupt Start. It also cost the City money unnecessarily.

iv. On May 22, 2020, upon information and belief, it appears that a highly motivated opponent of Start directed a false and fictitious email to be sent to City Council in an attempt to discredit Start. Ostensibly, a "Mr. William

11

H. Bray" of 1454 Bavarian Drive, Middletown, Ohio, sent the email that day. The e-mail complained about Start's supposedly "abysmal safety record over the past decade of operations at Hook Field" and stated that "they are willing to resort to lies, intimidation, and a deceitful public debate to get their way." However, upon examination, there is no William Bray living at 1454 Bavarian Drive, and the email address he used (whbray1957@gmail.com) had only recently been used for the first time. This begs the question of whether William Bray exists, or whether city personnel were behind this defamatory email. Despite this "Mr. Bray" never having appeared in person, and apparently not even living where he claimed to live, Mr. Dickten then invited him to become a member of the airport board. (Exhibit N, email from Dickten dated June 6, 2020).

f.  The City rewards one group – the flight school known as MRFTI operated by Tim Epperhardt – with free rental at airport facilities in exchange for providing periodic complaints about supposed safety issues caused by Start. None of the issues ever amount to anything significant, but free rent is provided by the City.

g.  In July 2020, the City sent some of these Complaints directly to the FAA without even telling Start about them. It demonstrates that they are not interested in working to improve safety, but rather, simply interested in discrediting Start. Dan Dickten later apologized and agreed that future issues should be raised with Start.

39. The City should be required to compensate Start for its wrongful behavior, and must be held accountable for failing to treat one of its valued citizens fairly and equitably.

### Count I – Civil Rights Violations under 42 U.S.C. § 1983
### (as to Dan Dickten, Matt Eisenbraun, and the City)

40. Start repeats and incorporates by reference the preceding paragraphs, as if fully restated herein.

41. Under 42 U.S.C. § 1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

42. At all times pertinent hereto, Dickten and Eisenbraun were City employees, acting under color of state law.  Defendants are all state actors.

43. Eisenbraun and Dickten are sued in both their individual and official capacities in all pertinent counts of this Complaint.

44. The Fourth Amendment to the United States Constitution gives every person the right to be secure in their persons, houses, papers and effects against unreasonable searches and seizures.  The right to be free from unreasonable searches and seizures is a clearly established right of which a reasonable person should be aware.

45. By hacking into, and/or directing a fellow City employee to hack into, Start's business management systems and to steal confidential and proprietary data, Dickten and Eisenbraun violated Start's right to be free from an unreasonable search and seizure.

46. Indeed, there was no search warrant, nor any probable cause, for Dickten and Eisenbraun's unauthorized access into Start's computer system.  To the contrary, it was

13

unauthorized and illegal. In Exhibit H, Dickten references using multiple people, including a former Start employee, to assist him in gaining illegal access.

47. Dickten and Eisenbraun knew or should have known that using a former Start employee in the effort to obtain access to a confidential computer systems was wrongful. Even their text messages show this point, as they questioned whether others would be comfortable participating in the hacking effort and whether outside mercenaries might need to be paid to do the wrongful deeds.

48. Upon information and belief, by hacking into Start's computer system, they: (i) obtained confidential and proprietary business data, such as Start's fuel usage and load volume; and (ii) were able to use it as part of the effort to strip Start of the FBO contract with the City, which was improperly stripped from Start as of January 1, 2020.

49. The City also is liable for its employees' Constitutional violations. The City had a policy or custom permitting its employees to violate Start's rights for the purpose of trying to force Start off of the airport where Start holds valid leasehold interests. Alternatively, the City had such a lack of training or supervision over its employees, such that said lack of supervision and training allowed Dickten and Eisenbraun to conduct their illegal hacking effort into Start's computer system. Alternatively, there is a custom of tolerance or acquiescence by the City of its employees' federal rights violations.

50. Indeed, to date, Eisenbraun has still not been fired, but continues to work for the City and to work against Start. And the City continues to condone its employees in carrying out a vendetta against Start, as shown in the recent unreasonable efforts to kick Start out of the airport. Even City Council's actions and positions show approval of this mistreatment of Start.

51. Defendants' conduct was objectively unreasonable. Further, they acted either intentionally, or with deliberate indifference and reckless disregard for Start's rights under the United States Constitution.

52. Defendants' Constitutional violations of Start's Fourth Amendment rights have caused substantial damages to Start.

53. Defendants are liable to Start under 42 U.S.C. § 1983 in an amount to be proved at trial. Defendants also are liable for the attorney fees Start has incurred as a result of their Constitutional violations.

54. If the City were to try to evict Start, that likewise would give rise to yet another claim under 42 U.S.C. § 1983 for violation of Start's Fifth and Fourteenth Amendment rights to due process before being deprived of their property rights.

### Count II – Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (as to Dickten, Eisenbraun, and the City)

55. Start repeats and incorporates by reference the preceding paragraphs, as if fully restated herein.

56. Dickten and Eisenbraun intentionally accessed Start's computers and related electronic databases without authorization (or exceeding any arguable authority), and thereby obtained confidential and/or proprietary information from Start in violation of 18 U.S.C. § 1030(a)(2).

57. Start's computers and related electronic databases were and are protected under 18 U.S.C. § 1030.

58. Start is entitled to bring a civil claim for this statutory violation by virtue of 18 U.S.C. § 1030(g).

59. The improper access by Dickten and Eisenbraun, which was either expressly or tacitly approved by the City, into Start's computer and related electronic databases has resulted in damage and expense to Start, including but not limited to the cost incurred for trained personnel to conduct a damage assessment, to act in mitigation of the breach, and to provide security updates, and also includes lost revenue, all in excess of $5,000.  The full amount will be proven at trial.  In addition, Defendants' conduct has impaired the integrity and/or availability of Start's protected computers, confidential and proprietary systems, and information.

60. The City either expressly participated in Dickten and Eisenbraun's illegal conduct under 18 U.S.C. § 1030(a), or alternatively the City conspired to commit such offenses under 18 U.S.C. § 1030(b).

61. The City is liable for these statutory violations for the reasons discussed above.

**Count III – Corporate Espionage, Conversion, and Misappropriation of Business Data
(as to Dickten, Eisenbraun, and the City)**

62. Start repeats and incorporates by reference the preceding paragraphs, as if fully restated herein.

63. During the summer of 2019, as discussed above, Dan Dickten, conspiring with Assistant Economic Development Director Matt Eisenbraun, engaged in financial and corporate espionage.

64. Dickten and Eisenbraun hacked into, and/or directed an effort to hack into, Start's business management systems to steal data.  They obtained data on Start's fuel usage and on Start's load volume.  This resulted in conversion of Start's confidential and proprietary business data.

65. Eisenbraun and Dickten accessed Start's confidential and proprietary data without authorization or permission.

16

66. In an effort to cover it up, Dan Dickten refused to produce text and/or email messages showing the wrongful plans – despite them being requested by Start in public records requests. Instead, when Dickten was fired for other issues, he gathered the evidence in a trash can and threw it into a dumpster at the airport. Dickten thus engaged in spoliation of evidence.

67. Dickten, Eisenbraun, and the City had no right or authorization to break into Start's computer system or to obtain its proprietary business data. In doing so, they converted and stole Start's proprietary business data (or trade secrets).

68. There can be no proper purpose for these actions, the apparent purpose of which was to be able to understand Start's business data, assisting them in their efforts to undermine Start, to undercut Start in ongoing negotiations about leasing and business issues, and to help them kick start off the airport.

69. This covert activity by Dickten, Eisenbraun, and the City justifies a claim under R.C. 1333.61, *et al*. (e.g., Ohio's Uniform Trade Secrets Act). Start's financial and accounting system is purposefully kept secret from the public. And the system and data housed therein derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons.

70. Therefore, in gaining access to Start's propriety system, Dickten, Eisenbraun, and the City have misappropriated Start's trade secrets.

71. The City is liable for these claims for reasons discussed above in Count I.

72. The actions of Dickten, Eisenbraun, and the City were malicious and designed to deceitfully undermine Start, entitling Start to compensatory and punitive damages in an amount to be proved at trial.

## **Count IV – Breach of Contract (as to the City)**

73. Start repeats and incorporates by reference the preceding paragraphs, as if fully restated herein.

74. Start and the City entered into a lease agreement and amendment, Exhibits A and B hereto, the "Agreement."

75. Start has at all times performed its obligations under the Agreement – namely, the timely and full payment of all monthly expenses due and owing to the City under the Agreement.

76. The City has breached the Agreement. It has done so in several respects.

77. The City did not provide or build out an additional 10,000 square feet of office space at the Property, as it promised to do in the Agreement. Instead, it induced Start to invest hundreds of thousands of dollars in capital improvements at the FBO space at the airport, only to now threaten to remove Start from the FBO space.

78. The City did not provide 6,000 square feet of storage space at the Property, as it promised to do in the Agreement. In fact, just the opposite occurred, as the City actually charged Start for the additional space Start required for storage purposes. The City owes reimbursement or credits to Start for that money, too.

79. Indeed, the City has at times reassured Start that it would reimburse Start for those fees and expenses. It has not done so. Instead, it has continued to improperly charge Start for amounts that are not owed.

80. As an actual and proximate result of the City's breaches of the Agreement, Start has been damaged in an amount to be proved at trial.

### Count V – Defamation (as to Matt Eisenbraun, individually and in his official capacity, and the City)

81. Start repeats and incorporates by reference the preceding paragraphs, as if fully restated herein.

82. As explained above, the City has engaged in a concerted campaign to discredit and diminish Start in the community.

83. This campaign has involved City personnel making false statements about Start and its business operations.

84. On or about December 3, 2019, Matt Eisenbraun falsely stated that Start was removed as the FBO operator after "numerous service complaints from pilots who were unable to get their planes fueled because the line services personnel were busy supporting the skydiving operations." There is no information to justify this statement.

85. Eisenbraun made this statement maliciously, in bad faith, and or in a wanton or reckless manner, without regard for whether it was true.

86. These statements were published, both orally and in a news article.

87. Alternatively, Eisenbraun made these statements manifestly outside the scope of his employment or official responsibilities with the City.

88. These statements were both defamatory *per se* and defamatory *per quod*.

89. These statements injured Start in its trade and occupation. Alternatively, the statements injured Start indirectly.

90. These statements damaged Start because they formed part of the basis for Start losing the FBO contract at the airport, and because they have served to discredit Start in the local community, costing it lost business revenue.

91. Matt Eisenbraun, both in his personal and official capacities, and the City are liable to Start for the damages they have caused by this defamation, in an amount to be proved at trial.

**WHEREFORE**, Plaintiff Start Skydiving, LLC demands the following relief against and from Defendants the City of Middletown, Dan Dickten, and Matt Eisenbraun:

A. Compensatory damages, including pre and post-judgment interest, in an amount to be proved at trial, but in excess of $75,000;

B. Plaintiff's costs, expenses, and reasonable attorney fees incurred in pursuing this matter; and

C. All other relief, monetary or equitable, which this Court deems just and appropriate.

Respectfully submitted,

*/s/ Richard D. Porotsky, Jr.*
Richard D. Porotsky, Jr. (0067234)
Andrew B. Cassady (0092413)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
Phone: (513) 977-8200
Fax: (513) 977-8241
richard.portosky@dinsmore.com
andrew.cassady@dinsmore.com

*Counsel for Plaintiff*
*Start Skydiving, LLC*

## JURY DEMAND

Plaintiff hereby requests a trial by jury in this matter.

Respectfully submitted,

*/s/ Richard D. Porotsky, Jr.*
Richard D. Porotsky, Jr. (0067234)